**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **C.A. NO. 00-035L** |
| **FAIRWAY CAPITAL CORPORATION** | ) | |
| **Defendant.** | ) | |

**RECEIVER'S RESPONSE TO THE GOVERNMENT OF THE VIRGIN ISLAND'S MOTION OBJECTING TO THE RECEIVER'S RECOMMENDED DISPOSITION OF CLAIMS**

The United States Small Business Administration, as Receiver for Fairway Capital Corporation ("Receiver"), files this response to the motion of the Government of Virgin Islands ("GVI") objecting to the Receiver's Recommended Disposition of Claims. For the reasons stated in the accompanying memorandum, this Court has subject matter jurisdiction to determine the equitable and monetary claims that the GVI has placed before it. In fact, the Court has exclusive jurisdiction over those claims, because they affect a significant asset of the Fairway Estate, and abstention would be inappropriate.

The GVI has not met its burden of proving its equitable claim for immediate possession of the Hotel on the Cay Resort. As for its monetary claims, the Receiver's recommendation is based upon previously established facts, and the GVI has not come forward with any evidence to support its claims beyond the amounts approved by the Receiver.

For the forgoing reasons, the Receiver submits that the Court should approve its recommended disposition of the GVI's monetary and equitable claims.

Respectfully submitted,
U.S. SMALL BUSINESS ADMINISTRATION,
as Receiver for Fairway Capital Corporation

By: Thomas W. Rigby spn

THOMAS W. RIGBY
(VA Bar No. 34663; DC Bar No. 463532)
Chief Counsel for SBIC Liquidation
Office of General Counsel
U.S. Small Business Administration
409 Third Street, S.W., 7th Floor
Washington, D.C. 20416
Telephone: (202) 619-1610
Facsimile: (202) 205-7154
Attorney for the Receiver

Stacey P. Nakasian, Esq.
Duffy Sweeney & Scott, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700
(401) 455-0701-Fax

Dated: 7/1/05

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **C.A. NO. 00-035L** |
| **FAIRWAY CAPITAL CORPORATION** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF RECEIVER'S RESPONSE TO THE GOVERNMENT OF THE VIRGIN ISLAND'S MOTION OBJECTING TO THE RECEIVER'S RECOMMENDED DISPOSITION OF CLAIMS**

This Court established a Claims Bar Date by Order dated May 2, 2001. Pursuant to that Order, the Court required that all claims against the receivership estate of Fairway Capital Corporation ("Fairway") - along with all supporting arguments and documents - be submitted to the Receiver no later than August 6, 2001. In response to the Receiver's notice of the Claims Bar Date, the Government of Virgin Islands ("GVI") submitted equitable and monetary claims to the Receiver and for this Court's approval. The GVI's equitable claim is that it is entitled to immediate possession and use of Protestant Cay and the Hotel on the Cay Resort (the "Resort"). The Resort is relevant to this Estate because the Receiver owns approximately 1,400 timeshare units at the Resort that may be worth in excess of $3,000,000.[1] GVI's monetary claims are based largely upon "Amendment II" to a certain lease of the Resort and operational activities of Fairway and its related entities, discussed below.

[1] The GVI's pending claims to the Resort has clouded the market for these timeshare units and made their marketing and sale all but impossible. Nevertheless, the Receiver believes that the timeshare units have substantial value if their title can be cleared in a timely fashion.

## I. BACKGROUND

As conceded by the GVI, the Resort is currently in the possession of and being operated by the Hotel on the Cay Time-Sharing Association, Inc. ("HOTC") pursuant to a Stipulated Settlement entered into in 1998 by HOTC and a prior administration of the GVI. The current administration is trying to invalidate that settlement and retake possession of the property. If the GVI prevails in its efforts, the 1,400 timeshare unit assets of this Estate will be lost. For this reason, the issues presented by the GVI's claim must be decided by this Court, which has taken exclusive jurisdiction over Fairway's assets, including the 1,400 timeshare units.

The GVI asserts that this Court lacks subject matter jurisdiction to decide its equitable claim. The Receiver submits that the GVI has invoked this Court's jurisdiction by bringing approximately $1.45 million in monetary claims in this action and submitting its equitable claim to the Receiver as part of the Claims Bar Date. In addition, as set forth at length below, the GVI's jurisdictional argument and most of its other arguments are based on several fundamental mischaracterizations of rulings in related cases and misstatements of Rhode Island law. Once those mischaracterizations are exposed, the GVI's objection fails.

Alternatively, the GVI asks this Court to abstain from deciding the issues underlying its equitable claim to repudiate the Stipulated Settlement. Abstention would not be appropriate for several reasons. First, this Court has taken exclusive jurisdiction to liquidate Fairway's assets under 15 U.S.C. § 687c, and under Federal law the Territorial Court cannot act where exclusive jurisdiction lies with a Federal District Court. 48 U.S.C. § 1611(b). Second, in considering the precursor jurisdictional issue, this Court necessarily will have determined most if not all of the issues pertaining to the equitable claim, so abstention will result in a duplication of judicial effort. Third, the issues to be decided present questions primarily of Federal and Rhode Island

law. Finally, the GVI's monetary claims are only before this Court. This Court cannot abstain from hearing those, and a determination of those claims is intertwined with a decision of the equitable claim issues.

## II. FACTS

### A. The Lease and Creation of the Timeshare Units.

Protestant Cay is an island owned by the GVI in St. Croix. On April 6, 1964, by Act No. 1179, the Legislature of the Virgin Islands authorized the Governor to negotiate a lease for Protestant Cay. See Appendix submitted in support of this response ("App.") Tab A.[2] Governor Ralph Paiewonsky did so and executed under his signature and without further approval of the Legislature, a ground lease dated May 5, 1964 (the "Lease") that leased the entire island of Protestant Cay to Hotel on the Cay, Inc. for 50 years. App. Tab B. This original Lease specifically states that the Governor, without need of further action by the Legislature, may approve an assignment of the leasehold interest. The GVI entered into two amendments of the Lease without further act of the Legislature. App. Tabs C and D. Amendment II is the basis for the GVI's monetary claims.

In 1980, the then owner of the leasehold interest for the island filed a declaration with the GVI creating a total of 2,912 weekly timeshare units at the Resort (the "Declaration"). App. Tab E. Only about 50% of the units were sold, leaving about 1,400 unsold units. The Receiver only claims an interest in those unsold units, and in no others, as will become important in correcting misstatements by the GVI concerning the "Pantheon Litigation," below.

[2] The authenticity of the documents in the Receiver's Appendix, other than certain pleadings and judicial opinions, have been stipulated to by the GVI in connection with the action pending in the Territorial Court of the Virgin Islands.

## B. Fairway Invests $1.7 MM in Legend Resorts.

The hotel and time-share arrangement went into bankruptcy in 1982 and struggled financially through the 1980s. Harborfront Properties, Inc. took an assignment of the Lease from the Trustee, with approval of the Bankruptcy Court in 1986. Legend Resorts, L.P. ("Legend") and TSA Acquisition, Inc. obtained the unsold timeshare units in 1990 from Protestant Cay, Inc., which had acquired them previously. GVI's Summary Judgment Memorandum, App. Tab F, at 9. Legend borrowed $1.7 million from Fairway (the "Legend Loan") to purchase those timeshare units and to obtain (later) an interest in the Lease.[3]

Among other things, Fairway obtained a mortgage on the Lease from Harborfront Properties, Inc., mortgages on timeshare units from Legend and TSA Acquisition, Inc. and became a 20% limited partner in Legend. Legend later took an assignment of the Lease from Harborfront on July 17, 1991, with the approval of Virgin Islands Governor George Farrelly.

In March of 1994, Participation Services Corporation ("PSC") was incorporated by Fairway to service the Legend Loan and other Fairway loans. At or about the same time, Fairway assigned to PSC its interest in the Legend Loan and related mortgages. The assignment violated SBA's regulations, and SBA instituted this action to obtain the return of those assets through this Receivership. The parties that were harmed by that violation – Fairway and SBA – have already had their interests vindicated by this Court. Neither SBA nor the Receiver ever characterized the assignment as void due to fraud. In its latest memorandum, the GVI repeatedly characterizes this assignment as a "fraudulent transfer," see, e.g., Memorandum of Law of the Government of the Virgin Islands in Support of the Motion Objecting to the Receiver's

[3] Moneta Capital Corp., Wallace Capital Corp. and Richmond Capital Company all participated in that loan. Accordingly, a determination regarding the GVI's claims in this case will also affect the Moneta Receivership and the rights of Wallace that were assigned to SBA as partial satisfaction of SBA's judgment against Wallace.

Recommended Disposition of Claims ("GVI's Memo.") at 20; but for reasons stated in the next section of this memorandum, that is simply not true and no Court has ever found it to be so.

In September 1994, Participation Management Corporation ("PMC"), a subsidiary of PSC, entered into an agreement with Legend to manage the Resort. PSC through PMC, managed the Resort from September 2004 until May 31, 1997. In or about May 1997, the timeshare unit owners joined together to form HOTC and took over operation of the Resort on June 1, 1997.

**C. Foreclosure on the Timeshare Units and GVI's Eviction Action.**

In 1994, PSC commenced a foreclosure action against Harborfront, Legend and TSA Acquisition (among others) on the various mortgages (the "Foreclosure Action"). The GVI was named as a defendant in that action. On October 4, 1994, PSC recorded a lis pendens on the property. The GVI was named as a defendant in the lis pendens, as well. Judgment entered in the Foreclosure Action in favor of PSC and against the GVI, among others, on December 17, 1996. App. Tab G. Subsequently, PCS acquired the timeshare units at a foreclosure sale.

At no point – until now – has the GVI ever challenged the validity of the foreclosure and sale of the timeshare units. Its claim submitted to the Receiver under the Claims Bar Date only challenged the foreclosure sale (but not the foreclosure) of the Lease. For the first time, the GVI now challenges the foreclosure judgment and sale regarding the timeshare units as "invalid and fraudulently procured." GVI's Memo. at 39. Once again, however, the GVI's characterization is both inaccurate and misleading, as discussed in the next section of this memorandum.

While the PSC Foreclosure Action was still pending in 1996, the GVI sent notice to Legend that it was terminating the Lease. App. Tab H. Subsequently, GVI brought a debt and eviction action to regain possession of the property. Over the GVI's objection,[4] PSC sought and

[4] GVI objected to PSC's right to maintain the action for failure to pay franchise taxes. The objection was denied. The court noted that the GVI did not challenge PSC's intervention on the merits.

obtained leave to intervene in that action based upon the Foreclosure Action and proceeded to assert its claim to the property. HOTC also intervened.

Ultimately, on May 22, 1998, GVI and HOTC entered into a Stipulated Settlement pursuant to which the GVI recognized HOTC as the lessee of the Resort. App. Tab I. The Stipulated Settlement, like all prior Lease amendments and assignments, was signed by the Governor. It also was executed under the name of the GVI's highest legal counsel, the Attorney General. It expressly preserves the Declaration and thereby all of the timeshare units, including the 1,400 units held by the Receivership Estate. As stated in the Receiver's Recommendation to this Court on the disposition of all Bar Date claims, the Receiver recommends that this Court declare HOTC the rightful holder of the leasehold premises under the Stipulated Settlement. The Receiver will then be able to market and sell the 1,400 units to generate funds to pay creditors of Fairway (including the GVI) and the participants in the Legend Loan.

After reletting the Resort to HOTC in the Stipulated Settlement, there was a change in administration of the GVI. The new administration wants to undo the GVI's agreement with HOTC and take back possession of the Resort. Toward that end, it is arguing now that the Stipulated Settlement is invalid because it was never approved by the GVI legislature. However, legislative approval was no more required for the settlement than for any prior Lease amendment or assignment. GVI cannot legitimately dispute the validity of lease amendments entered into without legislative approval, since it is relying entirely on such amendments to support its claim for default (and termination) of the Lease and for $1.45 million monetary claims against this Estate. Therefore, if the Court does find the Stipulated Settlement to be void, then Amendment

to the Lease, as well as all other amendments and assignments, must be found void as well, and all monetary claims of GVI against the Fairway Estate must be denied.[5]

**D. <u>The Fairway Receivership was Established in part to Marshal and Liquidate the Timeshare Units.</u>**

This matter commenced with SBA's filing of a civil complaint under 15 U.S.C. § 687c that cited Fairway for the improper transfer of the Legend Loan, among other things. The Receivership Estate was instituted by Order dated May 13, 2000 (the "Receivership Order"). In that Order, this Court took exclusive jurisdiction of Fairway "and all of its assets and property, of whatever kind and wherever located." The Receivership Order specifically applies to "assets transferred by Fairway in violation of applicable statutes or regulations governing Small Business Investment Companies." The Receiver timely filed a copy of the Complaint and the Receivership Order in the District Court for the Virgin Islands under 28 U.S.C. § 754.

The Receivership Order charged the Receiver with responsibility for marshalling and liquidating Fairway's assets and satisfying claims of creditors "in the order and priority *as determined by this Court.*" Receivership Order, para. 1 (emphasis added). Pursuant to that Order, the Receiver served a contempt motion against Arnold Kilberg and others for return, among other things, of the timeshare unit assets to full control of the Fairway Receivership Estate.

At the time of that motion, the timeshare assets were being controlled by Pantheon Enterprises, Inc. ("Pantheon"), formerly known as PSC. This Court entered an Order April 2, 2002 which declared that all assets recorded in the U.S. Virgin Island land records in Pantheon's

[5] PSC undertook the operations of the Resort only because Governors Paiewonsky and Farrelly executed amendments and assignments of the Lease so that PSC could establish a chain of title for the mortgage. Acceptance of GVI's repudiation of all amendments and assignments means that there never really was an identifiable leasehold interest that anybody could claim in the 1980s or 1990s, a situation created by the GVI's highest officials. Fairway cannot fairly be held liable even for the alter ego claims in such a situation.

name be deemed transferred to the Fairway Receivership Estate in the name of the Receiver. The Receiver also recorded an assignment on the land records of St. Croix. In this way, the unsold timeshare units of the Resort officially were marshaled into this Receivership Estate. Subsequently, the Receiver learned that Fairway actually owned PSC/Pantheon, in addition to the alter ego relationship. This Court recognized that fact by an Order dated January 8, 2004. Thus, PSC/Pantheon and all of its assets were part of the Fairway Estate all along.

It is estimated that the timeshare units have a value that may exceed three million dollars, although there are uncertainties in marketing and sale, especially due to the cloud of litigation caused by the GVI's claim that they have been terminated with the Lease. That asset will have no value if the GVI succeeds in its efforts to renege on its agreement with HOTC and take back possession of the Resort.

### E. <u>The Claims Bar Date and Why the GVI Should Be Happy with the Receiver's Recommendation.</u>

As noted previously, the Court established a Claims Bar Date of August 6, 2001 with a Notice approved by the Court. The Receiver served a copy of the Notice on the GVI and published the Notice in a newspaper of general circulation in St. Croix. In response to the Notice, the GVI submitted its equitable and monetary claims to the Receiver for this Court to decide.

The GVI's claims were presented in detail in the Memorandum in Support of its Motion for Summary Judgment against PSC/Pantheon. App. Tab F. The Receiver reviewed each of the allegations and GVI's supporting documents, reviewed the arguments that PSC/Pantheon had asserted and then prepared its Recommendation. The Receiver determined that the fairest, most legally supportable and most equitable result was to abandon PSC/Pantheon's opposition to the Stipulated Settlement and thereby eliminate the dispute among the GVI, HOTC and

PSC/Pantheon over the Lease. The GVI should have welcomed the Receiver's Recommendation. The litigation would be at an end and the GVI would have prevailed on the most important issue – HOTC, not PSC/Pantheon, would be recognized as the holder of the Lease, as specifically desired by the GVI under the Stipulated Settlement.[6]

In effect, the Receiver's Recommendation has given the GVI everything it asked for in the Eviction Action, and more.[7] However, because the GVI reversed course and attacked its own settlement signed by its own Governor, the Receiver's Recommendation refutes the GVI's newly mounted challenge to the existence of the Receiver's 1,400 timeshare units and the validity of Stipulated Settlement. Notably, the GVI in its objection does not try to counter the Receiver's arguments made in the Recommendation. Instead, the GVI has constructed new arguments based upon new legal theories and significant misstatements of fact.[8]

## III. MISSTATEMENTS OF FACT BY THE GVI

The GVI has mischaracterized or misstated several key facts in order to support its objection. Before responding to the GVI's arguments, those misstatements will be addressed.

**Misstatement: The Lease was terminated.**

In 1996, the GVI notified Legend that it was terminating the lease under Amendment II and commenced a debt and eviction action in the Territorial Court of the Virgin Islands. PSC was granted leave by that court to intervene to challenge the termination. PSC took the position

[6] The Receiver sympathizes with the GVI in the GVI's desire not to have had an Arnold Kilberg-controlled Pantheon in charge of the property prior to the commencement of this Receivership.

[7] The Receiver recommended allowance of vast swaths of the GVI's monetary claims, including recommending priority for many of them, where the only disputes concern the time period Fairway's alter ego entities were in control of the property.

[8] This is the GVI's third "bite at the apple." First, in its lift-stay Motion, the GVI offered its Summary Judgment Memorandum to try to meet the "ESIC Test's" prong regarding likelihood of success on the merits. The Court rejected those arguments. Second, as noted above, the Receiver's Recommendation refuted all of the GVI's key arguments. Hence, on a third attempt, the GVI chose to plot an entirely new course by making new allegations of "fraud" at every turn.

that Amendment II was invalid and so never admitted to termination under Amendment II. Notably, the court in the Eviction Action stated that: "If the Government [GVI] prevails on the merits, the leasehold interest *may* be terminated." Memorandum and Opinion Order, May 28, 1998, attached as Exhibit B to the GVI's Memo., at 4 (emphasis supplied). Clearly, not even the St. Croix Court has adopted GVI's assertion that the Lease was terminated in 1996.

While PSC's challenge was pending, the litigation was stayed as a result of the Order instituting this Receivership. Accordingly, the validity and effectiveness of the GVI's asserted termination of the Lease in 1996 has not been resolved, except to the extent the Stipulated Settlement proves exactly the opposite because it recognizes the Declaration and timeshare units as still in existence. The GVI is merely stating its position, and not a decided fact, when it represents that the Lease was terminated.

The GVI is also wrong in asserting that PSC acknowledged the termination of Legend's Lease in the GVI's Eviction Action. GVI's Memo. at 6. PSC sought and was granted leave to intervene in that action specifically to challenge the purported termination. In the event the Court upheld the termination, PSC sought entry of an order requiring that a new lease be entered into with PSC. That request was not an admission that termination had occurred.

**Misstatement: The assignment of the Legend loan by Fairway to PSC was a fraudulent transfer.**

In a separate action brought in this Court and heard by Judge Torres,[9] HOTC asserted claims against PSC, Fairway and others relating to the operation of the Resort ("the HOTC Action"). In the HOTC Action, Judge Torres held that Fairway was jointly and severally liable with PSC for amounts owed to HOTC. Judge Torres based this ruling on a finding that "PSC was created for the sole purpose of 'servicing' the loan made to Legend by Fairway and the other

[9] HOTC v. Kilberg, et al., C.A. No. 97-279T (Judge Torres), Memorandum and Order dated April 6, 2000.

entities for which Fairway acted as lead lender. The loan was assigned to PSC for no consideration and PSC was merely a conduit for collecting the amounts due and turning the payments over to Fairway." App. Tab J at 22.

Contrary to the GVI's repeated assertion, Judge Torres did not hold that the assignment of the Legend Loan from Fairway to PSC was a fraudulent transfer or void. Nor do the facts, as the Court found them, support such a statement. "Under Rhode Island law, a transfer is fraudulent if the conveyance is made (1) with actual intent to defraud, or (2) for less than adequate consideration when, before or after the transfer, the debtor is insolvent." United States v. Verduchi, 2005 U.S. Dist LEXIS 7938, *9-10 (D.R.I. 2005). No evidence was presented to Judge Torres, and none exists, that the assignment of the Legend Loan by Fairway to PSC was done either with the intent to defraud or at a time when Fairway was insolvent. The only argument made was that the assignment was without consideration and, for that reason, Fairway was jointly liable with PSC in connection with PSC's operation of the Resort. That fact alone does not make the transfer fraudulent or provide a basis for the GVI, a third party, to invalidate the Lease.

The transfer by Fairway to PSC did violate SBA regulations and was ultra vires. Those wrongs have already been fully remedied by this Court. Voiding the transfer to deny the Fairway Estate title to the units would stand 15 U.S.C. § 687c and this Receivership on their heads by denying to the Estate the very assets it was established to marshal and liquidate. The GVI has no standing to enforce SBA regulations in any event. In addition, by statute, Rhode Island has specifically determined that such ultra vires acts are not void. R.I. Gen. Laws § 7 1.1-6.

**Misstatement: The judgment for foreclosure obtained by PSC is invalid and was obtained through fraud.**

In 1994, PSC brought a foreclosure action against Legend on the Legend loan. In response, Legend consented to the entry of judgment on the foreclosure. The consent judgment was signed in November 1996 for Legend by its general partner, N.E.B., Inc. ("NEB"). NEB's corporate charter had been revoked a year earlier. Based on that fact, the GVI asserts that the consent judgment is void and, therefore, that PSC's foreclosure is invalid.[10]

The GVI's advocacy on this point is undermined by three independent facts. First, the Foreclosure Action continued after the entry of the allegedly invalid consent judgment. The Territorial Court ultimately entered judgment after motions and a hearing in which it determined that PSC was entitled to judgment on the promissory note and for foreclosure on the timeshare units.[11] App. Tab. G. Thus, the foreclosure was not based on the consent judgment, but rather on a full judgment rendered a month later by the Court.

Second, the GVI was a party to the PSC Foreclosure Action. It did not then challenge the validity of either the consent judgment or the judgment for foreclosure. Final Judgment for foreclosure entered in favor of PSC in that action. Because PSC's ability to foreclose was presented and finally determined in the Foreclosure Action, and because GVI was a party to that action, it is estopped by the doctrine of claim preclusion and;/or issue preclusion from attempting now to relitigate the validity of that foreclosure. See Larson v. United States, 84 F.Supp. 2d 218, 221 (D. Mass. 2000); Boston Scientific Corp. v. Schneider AG, 983 F. Supp 245, 255 (D. Mass. 1997). Accordingly, it is estopped from doing so now.

---

[10] As for the GVI's allegation that the foreclosure was obtained through fraud, that appears to relate to the GVI's assertion that PSC obtained the loan through a "fraudulent transfer."

[11] Significantly, the Territorial Court also found that PSC was the successor to all rights held by Fairway. The GVI did not challenge that finding in the Foreclosure Action.

Third, even if the consent judgment was the basis for the foreclosure and the GVI could challenge that order now, its argument that the consent judgment is invalid has no merit. Rhode Island law applies, since NEB was a Rhode Island corporation. Under Rhode Island law, a corporate act is not invalid simply because the corporation lacked the capacity or power to do the act. R.I. Gen. Laws § 7-1.1-6. In such a case, the act may only be challenged by a shareholder of the corporation, the corporation itself, a receiver, or in certain proceedings by the Rhode Island Attorney General. Id. Thus, the prior revocation of NEB's corporate charter does not affect the validity of its execution of the consent judgment, and the GVI lacks standing to make that assertion.

**Misstatement: PSC's mortgage interests in the timeshare units were declared void in the Pantheon Decision.**

The GVI states that in an action brought by Pantheon, as successor to PSC,[12] the Territorial Court held that Pantheon's timeshare mortgage "was *void ab initio as a matter of Virgin Islands law*." GVI's Memo. at 9 (emphasis in original). The GVI has mischaracterized the ruling in that case, which concerned a different mortgage and different timeshare units.

In that action, Pantheon was seeking to assert its mortgage on the Lease from Harborfront (not Legend) as a lien against timeshare units that had been sold prior to the recording of the mortgage. The unit owners did not sign the Harborfront mortgage, only Harborfront signed it. Not surprisingly, as they never signed a mortgage when they bought their units, the timeshare unit owners argued that the mortgage could not encumber their property interests. The Territorial Court agreed, citing a Virgin Islands statute requiring that "every mortgage or lien affecting an apartment be paid and satisfied at the time of the first conveyance or lease of the apartment." Pantheon Enter., Inc. v. Hotel on the Cay Timesharing Ass'n, Inc., 1999 WL

[12] Pantheon Enter., Inc. v. HOTC, Civ. 553/1998 (Terr. V.I.).

744018 *3 (Terr. V.I. 1999) (emphasis added), included as App. Tab K. The Territorial Court held that "to the extent that Harborfront, or its successors [PSC and Pantheon], failed to satisfy the mortgage when they sold time-share estates in the apartment units, . . . any resulting liens on the units are void." Id. *4 (emphasis added).

PSC took the 1,400 units in foreclosure under mortgages from Legend and TSA Acquisition, not Harborfront. The Pantheon decision has nothing to do with those mortgages, but rather adjudicating the application of a completely separate mortgage.[13] In addition, as is clear from its holding, the decision only applies to timeshare units that had already been sold. Those owners had signed no mortgage. The timeshare units that are assets of the Fairway estate were the unsold units owned by Legend and TSA Acquisition. They were not units owned or mortgaged by Harborfront. Both Legend and TSA Acquisition executed the mortgages through which the Fairway Estate claims its chain of title. Those mortgages were foreclosed upon and purchased by PSC in the PSC Foreclosure Action to which GVI was a party.

**Misstatement: The Stipulated Settlement cannot be a "reletting" because it was made "free and clear of...all other prior leases" (GVI's Memo. at 41, emphasis by GVI, ostensibly quoting the Stipulated Settlement)**

The GVI's point in this (mis)statement is that the Stipulated Settlement, by its own terms, states that HOTC was taking the Resort free and clear of all obligations of "all other prior leases," meaning that it was not a reletting of the existing lease. This could be a significant point of contract interpretation in the GVI's favor if it were true that the Stipulated Settlement actually said that. It does not.

The Stipulated Settlement actually says that HOTC was taking free and clear of all obligations of "all other prior *lessees*" (emphasis added), not "leases." App. Tab I. The meaning

[13] All three mortgages – Harborfront, Legend and TSA Acquisition – were included in the documents submitted to the Receiver by GVI in support of its Bar Date claims.

of this language is clear: The GVI agreed not to hold HOTC liable for any prior defaults or obligations of other previous lessees under the Lease. The Receiver's Recommendation that the Stipulated Settlement is fairly read as a "reletting" therefore still stands. Since it preserves the Declaration and timeshare units, that is all the Receiver need establish.

## IV. ARGUMENT

The GVI for the first time raises several bases for challenging this Court's jurisdiction. Significantly, the GVI did not raise these arguments when it originally asked this Court to lift its stay to permit the GVI's claims to be heard in the Virgin Islands.[14]

### A. The Court's Subject Matter Jurisdiction Extends to the Timeshare Units.

The GVI asserts that this Court's jurisdiction only extends to assets that Fairway had at the time it was put into receivership. That argument is contradicted by the Receivership Order, which established this Receivership Estate, and many subsequent orders entered by this Court. It also is inconsistent with the GVI's other argument that the transfer of the Legend Loan by Fairway to PSC was a fraudulent transfer. If that argument is accepted, then the Legend Loan (and associated timeshare units and mortgages) remained assets of Fairway.

The Receivership Order expressly extended this Court's jurisdiction to Fairway "and all of its assets and property, of whatever kind and wherever located." Receivership Order para. 1. The Court appointed the Receiver "for the purpose of marshalling and liquidating all of Fairway's assets." Id. The Receivership Order specifically applies to "assets transferred by Fairway in violation of applicable statutes or regulations governing Small Business Investment

[14] The Receiver's objection, however, anticipated such an argument. The Receiver cited to relevant authority that the GVI's admitted lack of possession of the property allows the Receiver to claim possession of the timeshare units. 1 Clark on Receivers, § 288(b), p. 459 (3rd Ed. 1959) ("Control and possession of the property through the receiver is acquired when the receiver is appointed, the judicial process served and the receiver duly qualified although the receiver does not take actual possession of the property" (citing to Palmer v. Texas, 212 U.S. 118 (1908)). See also 13 Moore's Federal Practice, § 66.06[2] (receivership court's in personam jurisdiction over the defendant sufficient to reach all of defendant's property in other judicial districts).

Companies." Id. para. 7. Pursuant to that Order, the Receiver asserted that the Legend Loan, collateral and the 1,400 time-share units were assets of the Fairway Estate. The Court agreed and held Pantheon in contempt for its failure to turn those assets over to the Receiver. Thus, this Court has already determined that the timeshare units are assets of the Estate that have now been properly marshaled by the Receiver pursuant to the Receivership Order. The GVI alleges that its claims are superior and by implication that the Court's prior determination must be overturned, but that begs the question of who has authority to decide. The Receivership Order's invocation of 15 U.S.C. § 687c provides the Court all the authority it needs to resolve the GVI's claims.

The GVI raises several arguments in an effort to extinguish Fairway's interest in the unsold timeshare units. Each is without merit.

**1. The Lease and associated timeshare units were not terminated prior to the PSC foreclosure.**

The GVI argues that the 1,400 timeshare units no longer exist because they terminated when the GVI terminated Legend's Lease in 1996. This argument is wrong as a matter of law, and the GVI is estopped from making it.

As stated above, although the GVI purported to terminate the Lease in 1996 under Amendment II, PSC challenged that termination in the Eviction Action and its challenge has not been resolved. There has been no judicial determination that the Lease was terminated. On the contrary, as noted above, the Territorial Court has itself stated that it only "may" be terminated after resolution of the GVI's claims. In any event, PSC sued to foreclose on its mortgages on the 1,400 units two years prior to the alleged termination. The GVI not only knew about the prior Foreclosure Action but was a party to that suit. At no time in the foreclosure action did the GVI ever assert that the foreclosure could not proceed because the Lease had been terminated.

With the GVI's knowledge, PSC proceeded to a foreclosure sale and purchased the timeshare units. GVI's claim submitted to the Receiver challenged the sale of the mortgage interest in the Lease, but never challenged the foreclosure on the 1,400 timeshare units. See GVI Summary Judgment Memorandum, App. Tab F, at p. 12 ("However, although the judgment of foreclosure was followed by a Marshall's sale of the remaining unsold timeshare unit-weeks, the foreclosure sale was procedurally defective as far as the leasehold interest was concerned....").

The GVI cannot attempt to undo the foreclosure and sale of the timeshare units by claiming now that the units did not exist in 1996 due to a notice of termination of the Lease. If GVI was going to take that position with respect to the timeshare units, it was required to do so in the course of the foreclosure action. See Larson v. United States, 84 F. Supp. 2d 218, 221 (D. Mass. 2000); Boston Scientific Corp. v. Schneider AG, 983 F. Supp 245, 255 (D. Mass. 1997).

**2. Fairway's mortgage interest was not extinguished when NEB's corporate charter was revoked.**

In a rather desperate attempt to cut off Fairway's rights to the timeshare units, the GVI argues that Legend dissolved in 1995 when its general partner, NEB, had its corporate charter revoked. According to the GVI, that dissolution constituted an event of default under the Lease extinguishing Fairway's interests as the mortgage holder because Fairway took no action to foreclose in its own name prior to the Lease termination.[15] The GVI simply has the law wrong on this point.

Both Legend and NEB were entities organized under Rhode Island law. The facts relating to the revocation of NEB's charter are not in dispute. What is disputed is the effect of that revocation. The GVI claims that the revocation resulted in a dissolution of Legend pursuant

[15] Significantly, the GVI did not cite this alleged default as a basis for termination in the letter it sent Legend a year later purporting to terminate the Lease. See App. Tab H.

to R.I. Gen. Laws § 7-13-44, because NEB was Legend's general partner.[16] But all that the statute provides is that the remaining partners can no longer act as a limited partnership. If they continue to operate as a partnership, they will be deemed a general partnership with full joint and several liability for acts taken in connection with the partnership. That is exactly what Judge Torres concluded in considering these exact facts in the HOTC Action:

> Under Rhode Island law, a corporation ceases to be the general partner of a limited partnership when the corporation's charter is revoked. R.I. Gen. Laws § 7-13-23(9). Revocation is deemed an event of withdrawal. R.I. Gen. Laws § 7-13-23(9). Since a limited partnership cannot exist without a general partner, see id. § 7-13-1(7), revocation of the general partner's corporate charter dissolves the limited partnership. See id. § 7-13-44(3).
>
> Thus, Legend, as a limited partnership, was dissolved on November 28, 1995. By continuing to conduct Legend's business after that time, the former limited partners functioned as a general partnership, see id. § 7-12-17, and became jointly and severally liable for the partnership's obligations. See id. § 7-12-26.

App. Tab J at 22-23. Thus, Legend continued to operate after NEB's withdrawal. The effect of that withdrawal was simply to convert the partnership from a limited partnership to a general partnership.

In any event, contrary to the GVI's assertion, a Foreclosure Action was commenced prior to the Lease termination. PSC filed for foreclosure a year before NEB's charter was revoked and two years before the GVI purported to terminate the Lease. In an attempt to evade this fact, the GVI notes that Fairway did not seek to foreclose "in its own name." That makes no difference. PSC, as successor in interest to Fairway's position as mortgage holder, sued for foreclosure without challenge by the GVI. It is disingenuous for the GVI to assert that there was no foreclosure action prior to termination.

---

[16] The GVI also cites to R.I. Gen. Laws § 7-13-47 regarding distribution of assets to creditors. GVI's Memo. at 18. However, PSC/Pantheon had filed a lis pendens and suit in 1994, prior to the revocation of NEB's charter in 1995. The only creditor of record at that time was PSC/Pantheon, which followed through on its claims through the PSC Foreclosure Action.

Furthermore, as noted above, the foreclosure was not based on the consent judgment, but rather on a full judgment rendered a month later by the court. The Foreclosure Action continued after the entry of the allegedly invalid consent judgment. The Territorial Court ultimately entered judgment after motions and a hearing in which it determined that PSC was entitled to judgment on the promissory note and for foreclosure on the timeshare units. Also, as noted above, the court in the Eviction Action has itself made clear that termination of the Lease is yet to be decided.

### 3. <u>Fairway is not estopped from relying on the PSC foreclosure.</u>

Relying on two of the misstatements discussed above, the GVI argues that the Receiver is estopped from relying on PSC's foreclosure on the timeshare unit mortgage because: (1) the assignment of the mortgage constituted a fraudulent transfer, and (2) the consent judgment for foreclosure is void because it was signed by NEB after its corporate charter was revoked. As set forth above, Fairway's assignment of the Legend Loan and mortgage to PSC, although for no consideration, was not a fraudulent transfer and was not void. Likewise, the fact that NEB lacked power to sign the consent judgment does not invalidate the subsequent foreclosure judgment. Even if these arguments had merit, which they do not, the GVI was a party to the PSC Foreclosure Action and never raised them there. It is estopped from raising them now in an effort to strip the Receiver of the assets it obtained through that Foreclosure Action.

## B <u>The GVI Received Sufficient Notice of this Action and has Consented to Personal Jurisdiction.</u>

In a rather bizarre argument, the GVI claims that the docket in this matter "does not support any claim of proper service of process on the Virgin Islands; accordingly the Receiver's purported affirmative claim for possession against the Virgin Islands should be dismissed pursuant to Fed. R. Civ. P. 12(b)(5)." GVI's Memo. at 29-30. The Receiver served the GVI

with actual notice of this action and the Claims Bar Date as ordered by this Court. The Receiver also published Notice in the U.S. Virgin Islands in a form approved by this Court. The GVI has acknowledged this Court's jurisdiction both by filing a motion to lift stay, which was denied, and by submitting its equitable and monetary claims in this action in response to the Claims Bar Date Notice. Even in its most recent brief, the GVI asks this Court to enter judgment against Fairway on its claims. See GVI's Memo. at 47 ( "Thus, judgment in favor of the Virgin Islands should be entered against the Receiver in the amount of $50,201.48 ...."). For these reasons, the GVI's service of process argument is a red herring.

### C. Abstention.

The Court should not abstain in favor of the Territorial Court in St. Croix.

#### 1. Congress intended that this Court control Fairway, its assets and claims.

Pursuant to 15 U.S.C. § 687c, the SBA is authorized to apply to the United States District Courts for an order enjoining violations of the Small Business Investment Act (the "Act"), enforcing compliance with the Act and appointing the SBA as federal receiver of the SBIC. See 15 U.S.C. § 687c(a)-(c). The District Court to which the SBA applies is authorized to take exclusive jurisdiction over the SBIC and its assets, wherever they are located. See id. § 687c(b).

When Congress passed the Act in 1958, the only enforcement mechanism it provided to the SBA for violations of the Act was application to the federal courts for revocation of the SBIC's license and injunctive relief to quell existing violations. See United States v. Norwood Capital Corp., 273 F. Supp. 236, 239-40 (D.S.C. 1967). When that proved insufficient to administer the provisions of the Act, Congress vested federal courts with exclusive jurisdiction over offending SBICs and gave the courts authority to enjoin future violations of the Act. See id. at 241. Finally, in 1966, Congress granted the SBA the power to be appointed as federal receiver

of offending SBICs based on the "complexity of liquidating longterm debt or equity investments in small business concerns and the difficulty in finding receivers experienced in dealing with this type [of] industry and sufficiently knowledgeable of the Act and the Small Business Administration's regulations to administer and liquidate an SBIC in accordance with the Act and Regulations." Id.

Cases on this issue universally hold that when a District Court assumes exclusive jurisdiction over an SBIC and its assets, it does so "to the exclusion of all other courts." United States v. Royal Business Funds Corp., 29 B.R. 777, 779-80 (S.D.N.Y. Bankr. 1983)(District Court jurisdiction precludes U.S. Bankruptcy Court from entertaining Chapter 11 petition); see also United States v. ESIC Capital, Inc., 685 F. Supp. 483, 485 (D. Md. 1988)(declaring state court lien null and void where it was obtained against SBA licensee's asset after District Court exercised exclusive jurisdiction); Norwood Capital Corp., 273 F. Supp. at 329-40 (District Court's assumption of exclusive jurisdiction stays pre-existing state court litigation).

In 1954, Congress authorized the legislature of the Virgin Islands to create local territorial courts pursuant to local law. 48 U.S.C. § 1611(a). Congress made clear that the legislature of the Virgin Islands could not grant any such territorial courts jurisdiction over matters over which the United States District Courts have exclusive jurisdiction. 48 U.S.C. § 1611(b). Moreover, Congress provided that relations between the Virgin Islands territorial courts and the courts of the United States are to be resolved by the laws of the United States pertaining to relations between the courts of the United States and the courts of the several States in such matters. 48 U.S.C. § 1613.

Here, as in the cases discussed above, when this Court assumed exclusive jurisdiction over Fairway's assets pursuant to 15 U.S.C. § 687c through its Receivership Order, it did so to

the exclusion of all other courts, including the Virgin Islands Territorial Court. This exclusive jurisdiction is required to effectuate Congress's intent that SBA receiverships protect the licensee's assets pending the SBA's recovery on its investment, to address the complexities inherent in these types of cases and to ensure that the receiver is sufficiently knowledgeable of the Act and the SBA's regulations concerning administration and liquidation of an SBIC. See Norwood Capital Corp., 273 F. Supp. at 240-41. Under 48 U.S.C. § 1613, the Virgin Islands Territorial Court is precluded from exercising jurisdiction over Fairway's assets just as the state courts in Norwood Capital Corp. and ESIC Capital, Inc. were prohibited from taking further action in their previously pending cases. For this reason, this Court should not abstain in favor of the Territorial Court's determination of the GVI's equitable claim.

**2. Summary disposition in this Court is warranted by Fed. R. Civ. P. 66.**

As argued in the Receiver's Memorandum in support of the Recommendation:

> The authority of this Court to set the proposed procedures is well grounded in receivership practice. Guaranty Trust Co. v. Williamsport Wire Rope Co., 19 F. Supp. 482, 483-484 (M.D. Pa. 1937) (establishing a claims bar date and affirming jurisdiction of receivership court to determine all claims); see also Clark: Law of Receivers, §§ 650 and 651 (3rd Ed.) ("When the court orders claims presented to the receiver, the receiver must accept or reject the claims. In doing so the receiver acts in many respects as a master and passes on the validity and fairness of the claims and also to their legality. When the court reviews the receiver's findings of fact and law and approves or disapproves the findings, the court's action is equivalent to a final order"). The Receiver also notes that this Court has approved the same summary procedure in the Wallace Receivership, C.A. No. 97-309T, and the Moneta Receivership, C.A. No. 99-565L.

Receiver's Memorandum in Support of the Recommendation, p. 4. The GVI has made no argument refuting or undermining that authority.

In SBA's experience involving hundreds of cases, courts liquidating SBICs under 15 U.S.C. § 687c have universally used the same Claims Bar Date Procedures as that established by this Court. The Receiver respectfully suggests that these procedures are the practices that have

been adopted by the Federal Court as contemplated in Rule 66 of the Federal Rules of Civil Procedure. The Receiver respectfully suggests that when Congress gave this Federal District Court the power to take exclusive jurisdiction over Fairway under 15 U.S.C. § 687c, it expected that the Court would retain its jurisdiction in all matters except where it was in the best interests of the receivership estate to abstain.[17]

### 3. Abstention factors favor decision in this Court.

The GVI has asked this Court to abstain from deciding its equitable claim in order that the issues underlying that claim can be decided in the pending Territorial Court action. The request is based on the abstention doctrine set forth in Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976). As this Court has noted, "federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'. . . Therefore, ordinarily, a federal court may neither dismiss nor stay an action merely because a similar action is pending in state court." Aetna Cas. & Surety Co. v. Kelly, 889 F. Supp. 535, 538 (D.R.I. 1995) citing Colorado River, 424 U.S. at 817. Abstention is permissible only in "exceptional circumstances," Fireside Nissan, Inc. v. Fanning, 828 F. Supp. 989, 993 (D.R.I. 1993), and in cases involving "the clearest of justifications," Aetna Cas. & Surety Co. v. Kelly, 889 F. Supp. 538 (D.R.I. 1995).

The Supreme Court has identified several factors a court should consider to determine if abstention is appropriate: (a) the assumption by either court of jurisdiction over property; (b) the inconvenience of the federal forum; (c) the desire to avoid piecemeal litigation; (d) the order in which the courts obtained jurisdiction; (e) the source of applicable law; and (f) the adequacy of

[17] Such as in the very limited abstention exercised with respect to the state court receiverships of the Kilberg Entities: Northeast Capital, Rosedale Properties, Hamlet Properties and Governor Financial. Even in those matters, the Court retained a final say over all claims. See Order dated January 8, 2004, known as the "Scope of Receivership Order."

the state proceeding to protect the rights of the party invoking federal jurisdiction. Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 15-16 (1982). The Court also has stated that the decision whether to abstain because of parallel state court litigation "does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." Id. at 937. When the factors are balanced in this case, abstention clearly is not appropriate.

Although the Territorial Court took jurisdiction over the GVI's action to retake possession of the Resort, and although that action was commenced prior to this Receivership action, the Territorial Court can not adequately protect the rights of the Fairway Receivership Estate. An SBA Receiver's rights and interests derive from federal law. In granting federal district courts exclusive jurisdiction over SBIC receiverships, Congress clearly declared that those rights are best protected and enforced in federal district courts. A state court, much less a territorial court of a United State territory, cannot adequately protect those rights.

The territorial courts of the Virgin Islands are not Article III courts. See Parrott v. Government of the Virgin Islands, 230 F.3d 615, 622-23 (3d Cir. 2000). Both the Virgin Islands territorial courts and the District Court of the Virgin Islands derive their respective jurisdiction from the Revised Organic Act, which serves as the Virgin Islands constitution, and not Article III of the United States Constitution. See 48 U.S.C. §§ 1541-1645. Congress created the Virgin Islands courts through the exercise of its authority to regulate the United States' territories under Article IV, s 3, not Article III, of the United States Constitution. See Parrott, 230 F.2d at 623. Two hallmarks of an Article III court that are lacking in the Virgin Islands territorial courts are that its judges are appointed by the President of the United States with the advice and consent of the Senate and the judges enjoy lifetime tenure during good behavior. See U.S. Const., Art. II, §

2 and Art. III, §§ 1-2. The judges of the Virgin Islands territorial courts, in contrast, are appointed by the Governor of the Virgin Islands and serve for an initial term of ten years. *See* 4 V.I.C. §§ 22(a) and (d). For these reasons, factors (a), (d) and (f) articulated in the Mercury Construction case weigh in favor of retaining jurisdiction.

The remaining factors – convenience of the federal forum, avoidance of piecemeal litigation, and source of applicable law – also support jurisdiction in this Court. The GVI is already before this Court to determine its $1.45 million in monetary claims. Resolution of those claims will involve consideration of many if not all of the issues underlying the GVI's equitable claim. For example, the GVI's claims relate to payments due under an amendment to the Lease. If the Lease was terminated in 1996, or if Amendment II is invalid for want of proper approval, then there is no basis for at least part of the payments claimed. If this Court abstains from hearing the GVI's equitable claim, the resulting litigation not only will be piecemeal but also duplicative and inefficient.

As for convenience of the federal forum, the issues are, for the most part, questions of law and the legal effect of undisputed facts. It is not anticipated that resolution of those issues will require an evidentiary hearing, so the convenience of witnesses is not an issue. HOTC and the Receiver are both represented in Rhode Island and would prefer the issues to be decided in this action. Because the GVI's counsels are located in Philadelphia and Providence, this Court is not inconvenient for them.

Finally, many of the most important underlying issues are controlled not by Virgin Islands law, but by federal law and the law of Rhode Island. Those issues include the effect under R.I. Gen. Laws § 7-1.1-6 of the revocation of NEB's corporate charter on its ability to consent to foreclosure on behalf of Legend Resorts, and whether under Rhode Island law the

assignment of the Legend loan by Fairway to PSC was void due to fraud. The principal remaining issue, the validity of the Stipulated Settlement, is a matter of contract interpretation. Because the Virgin Islands follows the Restatement of Laws for Contracts, this Court can decide that issue without having to engage in any novel interpretation of Virgin Islands law.

This Court should decline the GVI's request for abstention under the Colorado River doctrine. The other abstention authority cited by the GVI, the so-called "Princess Lida rule" is inapplicable. Neither the Princess Lida case nor any of the other abstention cases cited by the GVI involved property that was subject to the exclusive jurisdiction of the federal court under a statute such as 15 U.S.C. § 687c. Accordingly, this Court should, and must, retain jurisdiction and decide both the GVI's equitable and monetary claims.

### D. The GVI's Equitable Claim for Possession of the Resort Must be Denied Because the GVI Gave Possession to HOTC in the Stipulated Settlement.

The GVI tries desperately in its memorandum to divert the Court from the primary and, the Receiver submits, dispositive issue in connection with its equitable claim – the validity and effect of the Stipulated Settlement between GVI and HOTC.[18] Indeed, in its 49-page memorandum, the GVI devotes only two pages to this issue. The arguments it presents in that short discussion are addressed below and do not support invalidation of the Settlement that has been relied upon by all interested parties for the past seven years.

The GVI executed the Stipulated Settlement to end its litigation with HOTC while fending off PSC/Pantheon's claims to the Lease though its intervention in that litigation. At that

[18] In addition to the many other arguments already addressed, the GVI asserts that the Receiver is estopped from challenging the GVI's claim for possession. Its estoppel argument, which is set forth on pages 38-40 of its memorandum, is based upon the GVI's erroneous assertions that the Lease has been terminated, the PSC foreclosure is invalid, Fairway fraudulently transferred the Legend Loan to PSC, and the Pantheon decision declared the timeshare mortgage to be void. These assertions have all been refuted earlier in this memorandum.

time, HOTC was operating the Resort and was a party to the Eviction Action. As a partial resolution of that action, the GVI agreed to recognize HOTC as the lessee of the property.

First, even if the Stipulated Settlement were a new lease, it needs no more legislative approval than any of the previous amendments or assignments which the GVI claims are valid. The legislature authorized the Governor to negotiate a lease, it did not "approve" any particular document. As stated in the Receiver's Recommendation:

> The legislative approval in 1964 for a lease of Protestant Cay was an empowerment of the Governor to negotiate a new lease for Protestant Cay. It was not a legislative approval of only a single, specific document, viz., the 1964 Lease. The Governor did exactly that in negotiating the Stipulated Settlement with HOTC.

Recommendation, pp. 22-23 (emphasis in original).

But, as the Receiver made clear in its Recommendation at pages 23-25, the Stipulated Settlement is not really a new lease on the Resort. Instead, it is by its nature and terms an amendment to the original Ground Lease.[19] For example, the leasehold property is described in the Stipulated Settlement with reference to the Declaration that is part of the Lease, and the rent payments due are defined as a pro rata share of the lease payments due under the amended Lease. <u>See</u> App. Tab I, paras. 3.a. and 3.b. The Stipulated Settlement also makes it clear that HOTC, as the new lessee on the lease, takes its interest "free and clear from any obligations and defaults of . . . other prior lessees." App. Tab I, para 3a. Such language would not have been necessary if the Stipulated Settlement constituted a new, independent lease.[20]

---

[19] The GVI's own brief appears to admit of this fact. In an effort to attack its own agreement from every angle, the GVI argues that the Stipulated Settlement does not have sufficient material terms to stand alone as a lease. GVI's Memo. at 12 and 42. That may be true. But if true, that only further supports the Receiver's argument that it is merely another amendment that modifies and must be read with the existing Lease.

[20] In an effort to avoid this clear point, the GVI misquoted this clause of the Stipulated Settlement as stating that HOTC took "free and clear … of … other prior <u>leases</u>." GVI argued the clause supports a conclusion that the Stipulated Settlement is a new lease (hence the reference to <u>prior</u> leases). But that is <u>not</u> what the Stipulated Settlement says.

The validity and effect of this re-letting of the Resort to HOTC was not an issue for the GVI until it had a change in administration. Not happy with the agreement struck by the former Governor, the new administration seeks to renege on the agreement and retake possession. It now seeks to invalidate it by construing it as a new lease requiring new legislative approval. Such a construction violates basic principles of contract interpretation under the Restatement of Contracts that "an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts § 203(a) (2003). The Virgin Islands has adopted the Restatement of Laws. V.I. Code Ann. tit. 1, § 4 (2003) ("The rules of the common law, as expressed in the restatements of the law...shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary"). This Court has ample grounds to find the Stipulated Settlement valid and enforceable without further proceedings.

The GVI alternatively argues that the Receiver should not be heard on this issue because Fairway was not an intended beneficiary of the Stipulated Settlement. It is the GVI, not the Receiver, who placed this issue before the Court by asserting its equitable claim. In any event, the significance of the Stipulated Settlement to the Receiver is that it expressly recognizes the leasehold interest established in the 1980 Timeshare Declaration. It is that Declaration that created the 1,400 timeshare units that the Receivership Estate now owns. Prior to reaching the Stipulated Settlement, the GVI was asserting that the Timeshare Declaration expired when the GVI terminated the Lease. In agreeing to relet the Resort to HOTC, the GVI expressly acknowledged the continued existence of the Declaration and, as a result, the Receiver's timeshare unit interests were preserved. The GVI now seeks to undo that settlement and

eliminate the Receiver's timeshare assets. Clearly the Receiver has standing to challenge the GVI's actions, either as a beneficiary of the Stipulated Settlement or as a party whose property rights would be effected by the outcome of the GVI's actions.

Based on the foregoing, the Receiver recommends that this Court confirm the validity, effectiveness and enforceability of the Stipulated Settlement and the status of HOTC as the rightful holder of the leasehold premises as identified in the Stipulated Settlement until 2020.

### E. The Court Should Adopt The Receiver's Recommendations Regarding The Gvi's Monetary Claims.

The GVI originally asserted approximately $1.45 million in monetary claims against this Estate. The claims relate to (1) unpaid rent, (2) unpaid taxes, (3) unpaid workers compensation insurance premiums, and (4) unpaid unemployment insurance premiums, all of which are purportedly due under the amended Lease.

#### 1. Jurisdiction and validity of the Stipulated Settlement are threshold issues.

If this Court determines that either the GVI's execution of the Stipulated Settlement is invalid, or that the Court has no jurisdiction to hear the GVI's claims, then all of the GVI's monetary claims should be denied completely. First, if the Court has no jurisdiction to hear the GVI's claims, then the Receiver has no obligation to pay them from the Receivership Estate. The GVI cannot be allowed to deny this Court's powers to hear its claims and then demand payment at the same time. Second, if the Stipulated Settlement is invalid, then so are all of the amendments and assignments that the Receiver relied upon in recommending payment of claims and that PSC/Pantheon relied upon in taking over operations in 1994. The GVI, through its own repeated illegal acts of its succession of Governors from the 1960s all the way through 1998, would have unclean hands to ask this Court to award it any damages whatsoever.

**2. The Receiver's Recommendation for monetary claims is correct.**

The Receiver's Recommendation contains no scrivener's error. The Receiver's recommended disposition of claims assumes that the Lease is still valid and confirms possession in HOTC under the Stipulated Settlement. If those recommendations are adopted by the Court, then the Receiver has recommended that the Court allow the GVI's monetary claims in the total amount of $430,421.84.

The recommendations rely on two facts: (1) Judge Torres' finding that PSC/Pantheon's operation of the Resort ceased on June 1, 1997, App. Tab I, and (2) the fact that HOTC became liable for rent due under the Lease when the Stipulated Settlement became effective on June 1, 1998, App. Tab I. Based on these undisputed facts, the Receiver has recommended

(1) that the GVI's claim for unpaid taxes and insurance premiums be approved for amounts owed through May 31, 1997 – the last date PSC operated the Resort; and

(2) that the GVI's claim for rent be approved for amounts owed through May 31, 1998 – the day before HOTC became obligated for rent payments under the Stipulated Settlement.

Thus, contrary to the GVI's argument in its memorandum, there was no scrivener's error in the Receiver's recommended disposition of these claims. The recommendation accurately reflects the accepted liability based upon known facts. The only difference between the Receiver's numbers and the GVI's numbers are accounted for by this 12 month period of time.

The Receiver submits that a plenary trial on the GVI's monetary claims is unnecessary to resolve this issue. The relevant facts were heard and determined by Judge Torres as to the May 31, 1997 date, and the GVI's own agreement with HOTC sets June 1, 1998 as the other date used in the Receiver's calculations. The claims can be decided as a matter of law.

GVI's arguments that Judge Torres' decision has no estoppel effect on it are beside the point. The GVI had the burden of proof to establish its claims under the Claims Bar Date procedure establish by this Court. It offered no proof in its claim submission that PSC/Pantheon operated the property after May 31, 1997. It did not even make an offer of proof in its brief to contradict Judge Torres' findings. Where a claimant presents no evidence in support of its claim (for this time period), summary disposition would seem to be the most appropriate mechanism for disposing of that part of a claim. The Receiver respectfully asks this Court to recognize those facts as fairly decided and apply the summary procedures established by the Court.

Notably, the question whether PSC/Pantheon operated the property between May 31, 1997 and June 1, 1998 is the only factual issue over which there is any dispute between the Receiver and the GVI. The total effect on the GVI's claim of the disputed period of May 31, 1997 through June 1, 1998 is $59,130 out of more than $1.45 million of claims. Also notably, the Receiver's analysis and recommendations caused the GVI to withdraw hundreds of thousands of dollars of claims. The Receiver respectfully suggests that this narrow band of dispute (about 4% of the GVI's total claims) confirms that the Court's summary procedures are fair and appropriate to decide the GVI's claims.

## V. <u>CONCLUSION</u>

Based upon the above, the Receiver respectfully requests that the Court affirm the Receiver's Recommendation for disposition of the GVI's equitable and monetary claims. The GVI chose to avoid the points carefully made by the Receiver in its Recommendation and instead crafted new allegations of fraud involving NEB's corporate charter, PSC/Pantheon's violation of SBA regulations, new arguments challenging this Court's jurisdiction under 15 U.S.C. § 687c and new twists on its repudiation of its own Stipulated Settlement. All of the

GVI's arguments can be resolved under Federal law, Rhode Island law and the Restatement (Second) of Contracts. Furthermore, resolving the GVI's jurisdictional arguments requires the resolution of all of the key arguments about the timeshare units held by the Receiver.

In sum, the GVI submitted its summary judgment claim and monetary claims to the Receiver pursuant the Court's Claims Bar Date Order. The Court issued that Order pursuant to its authority under 15 U.S.C. § 687c. The Receiver respectfully suggests that the Court provide the GVI with the essence of all that the GVI has said it seeks – summary judgment of its claims.

Respectfully submitted,

U.S. SMALL BUSINESS ADMINISTRATION,
as Receiver for Fairway Capital Corporation

By: Thomas W. Rigby SP
THOMAS W. RIGBY
(VA Bar No. 34663; DC Bar No. 463532)
Chief Counsel for SBIC Liquidation
Office of General Counsel
U.S. Small Business Administration
409 Third Street, S.W., 7th Floor
Washington, D.C. 20416
Telephone: (202) 619-1610
Facsimile: (202) 205-7154
Attorney for the Receiver

Robert M. Duffy, Esq. (#4428)
Stacey P. Nakasian, Esq. (6638)
Duffy Sweeney & Scott, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700
(401) 455-0701-Fax

Dated: 7/1/05

# CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of July, 2005, copies of the foregoing ***Memo in Support of Receiver's Response to the Government of the Virgin Island's Motion Objecting to the Receiver's Recommended Disposition of Claims*** was served by first class mail, postage prepaid, upon the following persons at their last known address indicated hereon.

Lisa Dinerman, Esq.
Assistant United States Attorney
Office of the United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903

Allan E. Hanson, Esq.
District Counsel
SBA Providence District Office
380 Westminster Mall, 5th Floor
Providence, Rhode Island 02903

Arlene P. Messinger, Esq.
Assistant General Counsel/SBIC Enforcement
Office of General Counsel, 7th Floor
U.S. Small Business Administration
409 Third Street, S.W.
Washington, D.C. 20416

Robert Corrente, Esq.
Christopher Bush, Esq.
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903

C. Scott Summer, Esq.
Joseph L. DeCaporale, Esq.
Montaquila & Summer, P.C.
400 Reservoir Avenue
Providence, Rhode Island 02903

Andrew S. Richardson, Esq.
Ch. 7 Trustee
C.R. Amusements, LLC
182 Waterman Street
Providence, Rhode Island 02906

Gregory W. Hamilton, Esq.
P.O. Box 2376
Providence, RI 02906-0376

Frank D. Kirby, Esq.
Douglas J. Gervolino, Esq.
Kirby & Marullo
314 West Second Street
South Boston, Massachusetts 02127

K. Joseph Shekarchi, Esq.
33 College Hill Road, Suite 15e
Warwick, Rhode Island 02886

Peter G. Berman, Esq.
Raskin & Berman
116 East Manning Street
Providence, Rhode Island 02906

William J. Delaney, Esq.
Tillinghast, Licht, Perkins, Smith & Cohen, LLC
10 Weybosset Street, Suite 1000
Providence, Rhode Island 02903

Craig M. Scott, Esq.
Stacey Nakasian, Esq.
Duffy & Sweeney, Ltd.
300 Turks Head Building
Providence, Rhode Island 02903

Edward J. Bertozzi, Jr., Esq.
Edwards & Angell, LLP
2800 Financial Plaza
Providence, RI 02903

Lawrence L. Goldberg, Esq.
96 Jefferson Boulevard
Warwick, Rhode Island 02888

Jeffrey H. Gladstone, Esq.
Robert K. Taylor, Esq.
Partridge, Snow & Hahn, LLP
180 South Main Street
Providence, Rhode Island 02903

Thomas E. Carlotto, Esq.
Michael W. Carroll, Esq.
Schechtman, Halperin, Savage, LLP
86 Weybosset Street
Providence, Rhode Island 02903

Jeffrey S. Brenner, Esq.
Nixon Peabody, LLP
One Citizens Plaza, 7th Floor
Providence, Rhode Island 02903

With copies to:

Neal J. McNamara, Esq.
Holland & Knight, LLP
One Financial Plaza, Suite 1800
Providence, Rhode Island 02903

Arlene M. Embrey, Esq.
Office of General Counsel, 7th Floor
U.S. Small Business Administration
409 Third Street, S.W.
Washington, D.C. 20416

Karen Davidson, Esq.
One Ship Street
Providence, Rhode Island 02903

Stephen A. Rodio, Esq.
Rodio & Brown, Ltd.
91 Friendship Street
Providence, Rhode Island 02903

Everett A. Petronio, Sr., Esq.
Law Offices of Everett A. Petronio, Inc.
1239 Hartford Avenue
P.O. Box 19040
Johnston, Rhode Island 02919

Arnold Kilberg
Governor Financial Center
285 Governor Street
Providence, RI 02906

Cheryl Lynn Kilberg
1510 W. Orchard Place
Arlington Heights, Illinois 60005

Gary Dale Kilberg
90 Irving Avenue
Providence, Rhode Island 02906

Jennifer Leigh Kilberg
39 E. 12th Street, Apt. 512
New York, New York 10003

Bar Date Claimants (not otherwise on service list)

Bank Analysis Center, Inc.
City Place II – 16th Floor
Hartford, CT 06103

H. Marc Tepper
Buchanan Ingersoll, P.C.
Eleven Penn Center, 14th Floor
1835 Market Street
Philadelphia, PA 19103-2985

Richmond Square Capital Corp.
Richmond Square Capital Corp. 401(k) Profit Sharing Plan
c/o Harold I. Schein
One Richmond Square
Providence, RI 02906

Donovan M. Hamm, Jr., Esq.
5030 Anchor Way, Gallows Bay
St. Croix, Virgin Islands 00820

City of Pawtucket
137 Roosevelt Avenue
Pawtucket, RI 02860

Kenneth J. Taggart
7606 Bustleton Avenue
Philadelphia, PA 19152

John C. Dean, Esq.
Boisseau, Leonard & Dean, LLP
155 South Main Street
Providence, RI 02903

Norman Jay Bolotow, Esq.
99 Wayland Avenue
Providence, RI 02906

State of Rhode Island and Providence Plantations
Dept. of Administration
Division of Taxation
One Capitol Hill
Providence, RI 02908

Benedetto A. Cerilli, Jr.
Joan Cerilli
Estate of Joseph Cerilli
Legend Resorts, L.P.
80 American Way
Jamestown, RI 02835

Waste Management of Rhode Island, Inc.
575 West Street #210
Mansfield, MA 02048-1164

Jeanine T. Bourassa
71 Bliss Road
Newport, RI 02840

Wayne M. Kezirian, Esq.
Gaebe & Kezirian
128 Dorrance Street
Providence, RI 02903

Hotel on the Cay Timeshare Assoc., Inc.
P.O. Box 4020
Protestant Cay
Christiansted, St. Croix
U.S. Virgin Islands 00822

Joseph P. Ferrucci, Esq.
Ferrucci & Russo, P.C.
49 Weybosset Street
Providence, RI 02903

Louis A. Geremia, Esq.
Geremia & DeMarco, Ltd.
99 Wayland Avenue
Providence, RI 02906

Kevin D. Heitke, Esq.
1452 Broncos Highway, Suite 203
P.O. Box 556
Harrisville, RI 02830-0556

______________________________

USSBA\Fairway\Pleadings\USDC 00-035 (USSBA-Fairway)\Memo Rspnse to USGVI Mtn 07-01-05