UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA,
 Plaintiff,

v.           C.A. No. 00-35L

FAIRWAY CAPITAL CORPORATION,
 Defendant.

In re: Timesharing Associates, Ltd., Objection to Receiver's
   Motion for Order Approving Receiver's Recommended
   Disposition of Supplemental Bar Date Claims

<u>DECISION AND ORDER</u>

This matter is before the Court on the Objection filed by
Timesharing Associates, Ltd. (hereinafter "TSA"), to the
Receiver's Recommended Disposition of Supplemental Bar Date
Claims, as required by this Court's Consolidation Order of
January 8, 2004.  TSA asks this Court to recognize its equitable
claim for $723,017.43 against the receivership estate of
Defendant Fairway Capital Corporation ("Fairway"), a former Rhode
Island S corporation.  This tangled litigation involves multiple
investors in a time-share resort development on Protestant Cay, a
small island in St. Croix's Christiansted Harbor in the United
States Virgin Islands.  For the reasons explained below, the
Court accepts and adopts the Receiver's recommendation to deny
TSA's claims.

## Background

The pertinent chronology of the Hotel-on-the-Cay time-share
resort begins in 1964, when Wisconsin developer Oliver Plunkett

leased a small island known as Protestant Cay from the Virgin Islands government, with the intent of developing and marketing a 2900-unit-week time-share resort.  By the early 1980's, Plunkett had sold only about half the units, including 400 to the present claimant, TSA,[1] a Wisconsin limited partnership formed for this purpose.  With the other half of the time-share units still unsold, Plunkett declared bankruptcy in 1982.  Plunkett then sold his interest in the island's ground lease to Harborfront Properties, Inc. ("Harborfront"), and his unsold time-share weeks to Protestant Cay Ltd.  In 1987, TSA also sold its remaining 323 unit weeks to Protestant Cay Ltd. in exchange for a purchase money mortgage of approximately $250,000, dated January 1988.  In 1990, Protestant Cay Ltd. sold its interests to Rhode Island limited partnership Legend Resorts, L.P. ("Legend"), and another company with the unfortunate (from the reader's perspective) name of TSA Acquisition, Inc., (hereinafter referenced collectively, along with Legend, as "Legend").  In order to make the purchase, Legend borrowed $1.7 million from Fairway, which took a mortgage on 1400 unsold unit-weeks, as well as a 20% interest in Legend.  At the same time, Fairway also obtained a mortgage on the ground lease from Harborfront.  Prior to entering into these transactions, Fairway was licensed as a Small Business Investment

---

[1] Plunkett was the original general partner of TSA, but TSA separated itself from Plunkett after his bankruptcy.

Company by the United States Small Business Administration

("SBA") and had borrowed $7.5 million on which it was required to

make periodic payments to the SBA.

From this point on, the transactions, involving both the

time-share weeks and the interests in the ground lease, become

increasingly convoluted.  The Court will summarize the most

pertinent of the subsequent transactions; however, for more

detail the reader is directed to the Court's earlier decision

under the same caption at 433 F. Supp. 2d 226 (D.R.I. 2006); the

First Circuit's affirmation at 483 F.3d 34 (1st Cir. 2007); and a

related, unpublished decision by Judge Torres, Hotel on the Cay

Time-Sharing Ass'n v. Kilberg, C.A. No. 97-279-T, 2000 WL

34019282 (D.R.I. Apr. 6, 2000).

In a continuing effort to secure payment on its 1987

Purchase and Sale Agreement with Protestant Cay Ltd., TSA took a

mortgage from Legend in August 1992.  In 1994, Fairway

incorporated Participation Service Corporation ("PSC") as its

successor, and transferred to it its title to the Legend loans

and collateral.  The SBA determined that this transfer was a

violation of its regulations, and accelerated Fairway's debt.

Soon thereafter, Legend conceded that it had violated the

promissory note due Fairway, and PSC initiated a foreclosure

action against Legend and Harborfront.  TSA, and several other

entities, were also named defendants in the action, which was

filed in the Virgin Islands Territorial Court.  PSC recognized
that TSA had a possible interest in some of the time-share weeks
stemming from its mortgage to Legend, an interest which arguably
went back in time to TSA's 1988 mortgage to Protestant Cay Ltd.
Consequently, PSC entered into negotiations with TSA, aimed at
enabling PSC to go forward with its foreclosure action against
Legend and Harborfront with no objection from TSA.

According to the parties, documents submitted with TSA's
claim show that, in May 1996, counsel for PSC granted TSA an
indefinite extension to answer PSC's Amended Complaint for
foreclosure.  It does not appear that the Territorial Court was
notified of this.  In any event, in July 1996, PSC filed a Second
Amended Complaint, along with an amended motion for summary
judgment against Legend.  According to the parties, PSC's summary
judgment memorandum contained an assertion that PSC had reached
"an agreement in principal" with TSA, a reference to the
negotiations between them that were ongoing, but incomplete.
According to the Receiver, PSC's motion for summary judgment also
included an assertion that TSA's judgment lien was subordinate to
PSC's mortgage.  TSA does not deny that it was served with these
documents.  Instead, TSA recalls that it believed the extension
to file its answer was still in place, and that the ongoing
negotiations with PSC would result in an agreement that would
protect its interests.  Indeed, in November 1996, PSC faxed the

-4-

outline of an agreement to TSA: TSA would forfeit its interests in the time-share units and allow PSC to foreclose, and, in exchange, TSA would receive 14.3% of the proceeds from PSC's future sales of the units.

Believing that its interests were, or would be, protected, TSA never answered the foreclosure complaint, nor did TSA enter an appearance in the Virgin Islands Territorial Court at the foreclosure action.  In December 1996, the Virgin Island Territorial Court granted PSC's motion to foreclose on Legend's loan.  See Judgment, Civil No. 727/1994, December 13, 1996, Territorial Court of the Virgin Islands, Division of St. Croix. The Territorial Court's findings included that Fairway's liens, recorded in January 1991, predated all other liens on the property and "covered everything associated with the Hotel on the Cay."  Two federal tax liens came next.  Then, TSA's lien, in the amount of $258,481.98 plus cost and fees, was accorded fourth priority, based on the Court's determination that the lien was recorded in December 1992.  In the Judgment, the Court also noted the agreement between TSA and PSC:

> A stipulation was entered by Timesharing
> Associates, Ltd. and Participation Services
> Corporation permitting Foreclosure and
> admitting that the lien held by the
> Defendant, Timesharing Associates, Ltd. is
> junior to the mortgage held by Participation
> Services Corporation.

After the Court's order, PSC proceeded to foreclose on Legend's

interests in the mortgage and the ground lease.

In May 1997, a formalized copy of the Agreement between TSA and PSC was generated, reflecting the terms proposed the previous November.  The Agreement states that TSA has "a mortgage, assignment of interest and/or judgment lien" on certain of Legend's time-share units and leasehold interests, pursuant to which TSA is owed $372,697.08.  The same month, the Territorial Marshal's Sale of Legend's assets took place in the Virgin Islands, at which PSC bought the Hotel on the Cay and all the unsold time-share unit-weeks for $2.5 million.  The Territorial Court then issued a Report of Sale, which provided an opportunity for any objections to the sale to be filed by mid-July 1997.

According to the Receiver's records, TSA executed the Agreement with PSC and sent it to PSC for signature in September 1997.  PSC never executed the Agreement, and the documents reflect no activity involving TSA for the next several years.

### Six and half years go by

In January 2000, the SBA filed a petition in this Court to place Fairway into receivership as a result of its various defaults.  Accordingly, on March 13, 2000, this Court appointed the SBA as Receiver of Fairway, and took exclusive jurisdiction of all the corporation's assets and property, pursuant to 15 U.S.C. § 687c.  This Court established August 6, 2001, as the bar date for all claims against the Fairway estate.  Though TSA

received notice of Fairway's insolvency, it made no claim against the estate. During the Fairway receivership proceedings, various entities[2] were determined to be alter egos of Fairway, including PSC's successor. In January 2004, this Court entered an Order consolidating claims involving these entities with the Fairway receivership, and establishing a supplemental bar date of March 1, 2005, for claimants with claims against the related entities to file their claims in the Fairway Receivership.

On February 25, 2005, TSA filed the present claim against the Fairway receivership estate in the amount of $372,697.08, plus interest since 1997, for a total of $723,017.43. In its claim, TSA asserts that it entered into an agreement with PSC under which TSA released its lien on the Hotel to permit PSC's foreclosure to go forward, in reliance on PSC's promise to pay TSA a portion of future sales and/or extensions of the Hotel's unit-weeks. TSA further asserts that PSC "assumed operation of and did operate the Hotel and sold unit weeks and extensions but took all proceeds of such sales and extensions for itself as opposed to delivering any portion of same to TSA." TSA submitted pertinent documentation including the unsigned Agreement with PSC and copies of various financial instruments identified in the Agreement. Following the Receiver's recommendation that TSA's

---

[2] These entities included Acropolis Enterprises, Inc., and Pantheon Enterprises, Inc., (f/k/a Participation Services Corporation), and their subsidiaries.

claim be denied in its entirety, TSA filed a timely objection
with this Court.

### Standard of review

In keeping with this Court's earlier decision regarding this
Receivership, 433 F. Supp. 2d at 232, and Fed. R. Civ. P.
53(f)(3-4), this Court will review the Receiver's findings of
fact and conclusions of law using a *de novo* standard of review.

### TSA's claim

TSA asserts that it has an equitable claim against the
Fairway estate in the amount (plus interest) of the 1988 purchase
money mortgage it received from Protestant Cay Ltd.  This
mortgage was transferred to Legend in 1992.

TSA develops an additional argument regarding the source of
its claim in its objection to the Receiver's recommendation.  TSA
asserts that, when Fairway took its mortgage from Legend, Fairway
neglected to identify a group of some 110-132 unit weeks,
ownership of which was retained by Protestant Cay Ltd.  TSA
claims that it obtained a *lis pendens* judgment for approximately
$258,000 in the Virgin Islands in 1991,[3] based on Protestant Cay
Ltd.'s failure to keep up with payments to TSA.  According to
TSA, this judgment became the priority lien against those 132
unit weeks.  After this, Legend obtained an extension of the

---

[3] The judgment appears to be dated December 7, 1992; but,
because the Court has concluded that this is not determinative of
TSA's claim, either date will suffice.

ground lease from the government of the Virgin Islands which necessarily included all the time-share units. Consequently, the extension of those 132 unit weeks was not included in the collateral pledged to Fairway. TSA's 1991 Virgin Islands judgment was never satisfied, and TSA asserts that the judgment is the priority lien on the 132 unit week extensions, and possibly all 455 unit-week extensions that had not been pledged as collateral to Fairway.

Based on this rationale, TSA argues that it should have been the first lienholder in line to be paid from the proceeds of the 1996 foreclosure on Legend's title. TSA states that its *pro rata* share of the proceeds "would have been in excess of $420,000 at that time." Were it not for PSC's misrepresentation to the Virgin Islands Territorial Court that it had entered into an agreement with TSA, TSA would have been paid from those proceeds before PSC since TSA's lien was superior to that of PSC. This forms the basis of TSA's claim against PSC and the general funds of the Fairway receivership estate.

Taking a slightly different tack, TSA also argues that PSC/Fairway is estopped from denying the validity of the unsigned Agreement, because PSC received the benefit of the Agreement when TSA released its claim on the time-share units, enabling PSC to go forward with the foreclosure action in the Virgin Islands Territorial Court. Alternatively, TSA argues that PSC

perpetrated a fraud on the Virgin Islands Court when it
represented that there was an Agreement or stipulation with TSA,
if PSC never intended to honor such an Agreement.   In response to
the Receiver's argument that TSA should have answered PSC's
foreclosure complaint, TSA points to the indefinite extension to
answer that it received from PSC in May 1996.   The foreclosure
action went forward in breach of this extension.

### *The Receiver's response*

The Receiver recommends the denial of TSA's claim on various
grounds.   First, it refuses to assign any legal significance to
the Agreement between TSA and PSC because, the Receiver asserts,
PSC never received any benefit from the Agreement because TSA's
liens were subordinate to PSC's all along.   Second, the Receiver
cites TSA's failure to file an answer, or seek an extension to
answer, or to respond in any way to PSC's Second Amended
Complaint for foreclosure, or its Motion for Summary Judgment.
Furthermore, the Receiver argues that TSA's allegations of fraud
are undermined by PSC's continued and documented efforts to
notify TSA of all its transactions.

TSA's failure to respond to the foreclosure proceedings in
the Virgin Islands has been compounded by its subsequent
inaction; at no time until 2005 did TSA make any attempt to
object or seek any kind of relief from any court involved in
allocating ownership of these time-share units and leasehold

interests.  The Receiver suggests that TSA's failure to take any affirmative action to seek redress bars it now from claiming that the foreclosure sale must be set aside, or that the unsigned Agreement must be enforced.

### Analysis

TSA alludes to two legal arguments, although neither is fully developed or supported.  Nonetheless, the Receiver has framed responses to these arguments.  TSA claims: 1) that the Virgin Islands' judgment of foreclosure should now be vacated by this Court because it resulted from PSC's fraudulent misrepresentation to the Territorial Court back in 1996; and 2) the unsigned sharing Agreement should be enforced because TSA fulfilled its part of the bargain.  TSA characterizes its claims as equitable: it wants this Court to right a wrong that it asserts was perpetrated when it acquiesced to the foreclosure sale in 1996 in the expectation of a sharing agreement that never materialized.  None of TSA's arguments have merit.  The Court will elaborate on each of TSA's meritless claims in turn.

### *The Virgin Islands judgment*

TSA states that the Judgment of foreclosure, issued by the Territorial Court of the Virgin Islands, Division of St. Croix, on December 13, 1996,[4] was obtained through PSC's fraudulent

---

[4] This document is titled, "Action for Debt and Foreclosure of Mortgage," Civil No. 727/1994.

misrepresentation that PSC had reached an agreement with TSA pursuant to which TSA agreed to relinquish its claims against the Hotel on the Cay.   The Receiver responds that any effort to vacate this judgment for fraud comes too late under Fed. R. Civ. P. 60, which provides relief from judgments under certain circumstances, including fraud, within a year from the entry of judgment.[5]   A motion to vacate the judgment under Fed. R. Civ. P. 60(b)(6), for "any other reason that justifies relief," is not specifically limited in time, but requires a finding of (1) timeliness, (2) the existence of exceptional circumstances justifying extraordinary relief, and (3) the absence of unfair prejudice to the opposing party.   <u>Teamsters, Local No. 59 v. Superline Transp. Co.</u>, 953 F.2d 17, 19-20 (1st Cir. 1992).   The Court concurs with the Receiver that TSA's claim lacks these elements.   More importantly, TSA has not made a motion pursuant to Fed. R. Civ. P. 60(b), so the Court will not further belabor the analysis.

### Full faith and credit

The judgment of the Virgin Islands Court is entitled to this Court's full faith and credit under 28 U.S.C. § 1738.   This Court is required to accept the judgment of a state or territorial

---

[5] The Virgin Islands Territorial Court employs federal procedural rules, as those rules are interpreted by the Third Circuit.   <u>See</u> <u>Camacho v. Dodge</u>, 947 F. Supp. 886, 890, fn. 6. (D.C.V.I. 1996).

court, to the extent the judgment was issued by a court with
proper jurisdiction and is considered a final judgment by the
issuing court.  Allen v. McCurry, 449 U.S. 90, 96 (1980);
Barreto-Rosa v. Varona-Mendez, 470 F.3d 42, 45 (1st Cir. 2006).

The finality of the foreclosure proceedings is evident under
Virgin Islands law, 5 Virgin Islands Code § 489, which requires
that objections to property sales must be made within five days
of the return of the writ of execution.  If an objection is filed
alleging "substantial irregularities" in the sale, the court may
direct that the property be resold.  Pursuant to 5 V.I.C. § 489
(4), when no objection is filed, "An order confirming a sale
shall be a conclusive determination of the regularity of the
proceedings concerning such sale, as to all persons, in any other
action, or proceeding whatever."

In Camacho v. Dodge, 947 F. Supp. 886 (D.V.I. 1996), the
District Court of the Virgin Islands, Appellate Division,
emphasized the importance of the finality of an execution sale
when the judgment debtor waited eleven months to object to the
sale based on a homestead exemption, as well as several other
alleged irregularities with the process of the sale.  After an
initial hearing, the Territorial Court vacated the order
confirming the sale, using the "substantial irregularities"
language of 5 V.I.C. § 489(2).  The Appellate Court rejected the
Territorial Court's analysis, concluding that it applied the

-13-

wrong legal standard and that "Rule 60(b) is the only vehicle"
for granting relief from a final order or proceeding.  Id. at
890.  The Court continued, "We hold that section 489 does not
provide a mechanism for vacating an order confirming a judicial
sale of real property after it has been entered, especially when
eleven months have elapsed."  Id. at 891.  The Court then
proceeded to perform an analysis pursuant to Fed. R. Civ. P.
60(b) in order to determine whether the irregularities alleged by
Dodge supported the vacation of the judgment.  While Dodge was
never served with a motion for an order confirming the sale of
her house, the Court concluded that Dodge's eleven-month delay
did not constitute "excusable neglect," under 60(b)(1).

> Moreover, we are unable to find that Mrs.
> Dodge's delay in filing any objections
> resulted from excusable neglect.  The record
> is replete with evidence that she had ample
> notice that her property had been attached by
> the marshal, knew that her property had been
> advertised for sale before it was sold, had
> been urged to attend the sale, and had been
> told after the sale that her property had
> been sold.  Since Mrs. Dodge already had
> knowledge of the information contained in the
> motion to confirm, we cannot find that the
> failure to serve her with the motion had any
> causal effect on her failure to file timely
> objections to the entry of the order
> confirming the sale without her objections.
> Moreover, Dodge waited more than ELEVEN
> MONTHS after the triggering event, the
> marshal's filing of his certificate of sale,
> to raise her objections by way of the motion
> to annul.

Id. at 892 (emphasis in original).  In the end, however, the

Court determined that Dodge's request for a homestead exemption
had been inadequately considered, and remanded the case for
further proceedings.  Id. at 893.  Urging the lower court to
develop procedures to educate judgment debtors about the
homestead exemption in order to avoid subsequent tardy
objections, the Court concluded, "[T]he finality and regularity
of judicial sales must be protected against the late claims of a
judgment debtor who only goes into action on the eve of the
expiration of the six-month or one-year right of redemption." Id.
at 894.

The Court provides these details from Camacho v. Dodge in
order to demonstrate the operation of the statute governing
judicial sales, 5 V.I.C. § 489, the importance placed by the
Virgin Islands' District Court on the finality of sales such as
the Marshal's sale of the Hotel on the Cay assets, and the
unlikelihood that the Territorial Court would entertain a motion
or objection under Fed. R. Civ. P. 60(b) brought six and half
years after the sale's confirmation.

In a case with some similarities to the dispute presently
before this Court, Lombard v. U.S., 356 F.3d 151 (1st Cir. 2004),
the First Circuit stressed the importance of the federal court's
honoring the finality of a state court judgment. In 1964, a
Massachusetts state court cleared title to an eight acre plot of
land that was then sold by its putative owner, George Higgins, to

the U.S. government to create the Cape Cod National Seashore. Thirty-plus years later, descendants of a prior owner, who had died in 1873, surfaced and claimed that Higgins had known of their whereabouts, and that the state court had not made adequate efforts to find and notify them prior to quieting title. Pointing out that there was "a strong public interest in fostering a regime by which titles can be traced and relied upon," the First Circuit refused to set aside the earlier judgment based on speculation about who knew what back in 1964. Id. at 155.

> Where a state court has adopted and followed a scheme as protective as that used in this case, we think the resulting judgment should not be invalidated by a different court even if a party to the original action wrongfully withheld private knowledge from the court.
> Were Higgins alive today and claiming ownership for himself, he might well be estopped from relying upon the quiet title judgment if he wrongly procured it. Similarly, the court that entered the judgment might, if a timely request had been made, have considered a motion to reopen its own judgment based on fraud, new evidence or the like. Cf. Fed. R. Civ. P. 60(b). Neither possibility applies here.

Id. at 156 (citation omitted).  This Court must apply this sound reasoning to TSA's tardy claim concerning the irregularities of the Virgin Islands' judgment of foreclosure.  Back in 1996, the Territorial Court followed an appropriate and rational protocol that provided ample notice, opportunities for objection and other

safeguards to the parties involved in the Hotel on the Cay
development.  This Court will not now unravel a judgment that was
final almost fifteen years ago, regardless of the nature of the
representations that PSC may have made to the court during those
proceedings.  Had TSA wanted to prevent the foreclosure and the
Marshal's sale, a timely entry of appearance and objection to the
Territorial Court would have been its most logical avenue.  Had
TSA wanted to object to the proceedings after the fact, then a
timely motion pursuant to Fed. R. Civ. P. 60(b), also brought in
the Territorial Court, would have been the proper course of
action.  However, TSA pursued neither strategy.  Consequently,
the Court concurs with the Receiver that TSA's argument based on
alleged irregularities of the Territorial Court's foreclosure
action must be rejected.

### The unsigned sharing Agreement

TSA asserts that the Receiver is estopped from denying the
binding validity of the sharing Agreement because TSA fulfilled
its side of the bargain by refraining from objecting to the
foreclosure sale, to the benefit of PSC.  At oral argument on its
claim, TSA suggested that enforcing the sharing Agreement might
be an acceptable remedy for its claim.  Had the sharing Agreement
been executed by PSC, it would have provided TSA with 14.3% of
the net proceeds of PSC's subsequent sales of Hotel on the Cay
time-share weeks.  However, according to the Receiver, no sales

-17-

have been made since the Fairway estate was placed into
receivership in 2000.  In addition, proceeds from any future
sales would be subject to multiple competing claims from other
claimants in the Fairway estate, including the Moneta and Wallace
Receivers, whose claims have already been adjudicated by this
Court.  If the date of the Agreement were established as of
November 1996, when PSC sent an outline of its terms to TSA, then
any proceeds obtained by PSC after that date are still subject to
the perfected security interest of the SBA.  Moreover, there is
no evidence before this Court of any sales of time-share units
subsequent to the date of the Agreement.  PSC has stated that no
units were sold in 1997, and the Receiver has no direct knowledge
of any sales from 1997 through March 2000.  Although TSA has
asserted in its claim that PSC sold unit-weeks but failed to hand
over any portion of the proceeds, TSA provides no record of these
transactions to the Court.  The Court will not base a judgment on
guesswork or speculation.

    In addition, the Statute of Frauds bars the Court from
enforcing a contract concerning the sale of real property that is
not signed by the party against whom enforcement is sought.  See
The Restatement (First) of the Law of Contracts § 178.  In the
absence of countervailing local law, the Restatement is the rule
of decision in the Virgin Islands.  1 V.I.C. § 4.  Although their
possession is temporary, owners of time-shares are considered to

be owners in fee simple absolute by the Virgin Islands courts, and, consequently, fall within the purview of the Statute of Frauds.  See <u>Bartley v. Virgin Grand Villas</u>, 197 F. Supp. 2d 291, 297 (D.V.I. 2002).  It would be impracticable to enforce the sharing Agreement, given the dearth of evidence of any sales during the pertinent time period.  At any rate, it would be impermissible under the Statute of Frauds.

### *TSA's equitable claim*

Finally, TSA seeks a remedy based on this Court's powers of equity.  Reiterating the arguments already described, TSA urges the Court to right the wrong that was perpetrated against it when the Virgin Islands Territorial Court allowed PSC to foreclose on its interests in the Hotel on the Cay, and PSC failed to execute the sharing Agreement.  In the earlier <u>Fairway</u> decision in which this Court evaluated the equitable claim of the Government of the Virgin Islands, this writer determined that it had wide discretion in an equity receivership to grant and fashion relief.  433 F. Supp. 2d at 241.  However, in this case, the equitable doctrine of laches operates as a bar to TSA's claim.

Laches may bar a claim even when the claim is brought within the applicable statute of limitations period.  <u>Pascoag Reservoir & Dam v. Rhode Island</u>, 217 F. Supp. 2d 206, 228 (D.R.I. 2002).  Since TSA's claim accrued in connection with PSC's transactions, its claim is properly brought within the period allocated by this

Court for claims against Fairway's alter egos, which include Pantheon Enterprises, Inc., PSC's successor.

Nevertheless, the Court concludes that TSA's claims are still barred by laches.  Under the doctrine of laches, a claim is barred if a party's delay in bringing it is unreasonable and results in prejudice to the opposing party.  K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 911 (1st Cir. 1989).  In this case, TSA's delay was unreasonable.  Even allowing its overly-optimistic reliance on the sharing agreement negotiations underway with PSC in 1996, at the time of the Virgin Islands foreclosure action; by 1997, TSA should have become concerned about its situation in the face of the Marshal's sale, as well as PSC's continued failure to execute and return the Agreement. Since that time, Fairway was placed in receivership in 2001 and TSA received notice of those proceedings.  Still, TSA apparently took no action until 2005 when it filed the claim herein.  Under these circumstances, one can only conclude that TSA had to know of its alleged rights, and was sleeping on them.

As for prejudice to the opposing party – in this case the SBA, it is sufficient to point out that this extremely complex and convoluted ten-year receivership is in its final stages. Countless hours have been spent by the Receiver and other interested parties, including this Court, untangling the competing claims and interests of various parties both on the

Virgin Islands and in the States, and assigning priorities to those claims. While TSA's investors did not fare well with their time-share venture, it's too late now for that to be remedied.

### Conclusion

For the foregoing reasons, the objection of Time Sharing Associates, Ltd., to the Receiver's Recommended Disposition of Supplemental Bar Date Claims is overruled, and TSA's claim is denied in its entirety. Consequently, all of the Receiver's recommendations are adopted and approved.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
May /8 , 2010